UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

KRISTAL HAYMOND,

              Plaintiff,

    -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

              Defendant.

**DECISION and ORDER**
**No. 1:11-CV-0631(MAT)**

───────────────────────────────

## I.   Introduction

Plaintiff Krystal Kay Haymond ("Plaintiff"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Social Security Insurance ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

Plaintiff protectively filed an application for SSI on December 19, 2008, alleging disability beginning on September 8,

---

[1]
    Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1984. T.115.[2] After the application was denied on initial review, Plaintiff filed a request for a hearing. She appeared, along with her attorney representative, before Administrative Law Judge William E. Straub ("the ALJ") on October 21, 2010. T.33-54. The ALJ left the record open until November 1, 2010, for Plaintiff's attorney to submit additional medical records. On December 22, 2010, Plaintiff's attorney submitted a supplemental brief. There also appears to be newly submitted records from, <u>inter alia</u>, Roswell Park Cancer Institute. <u>See</u> T.55-113. On November 22, 2010, the ALJ issued a decision finding that Plaintiff not disabled. T.18-28. That decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. T.1-3. This timely action followed.

## III. Summary of the Administrative Record

### A. Medical Evidence

On April 1, 2009, gastroenterologist Dr. Kevin T. Robillard saw Plaintiff due to her complaints of difficulty swallowing, a recent change in her bowel habits, and rectal bleeding. T.271. Prior CT scans showed hepatic lesions, hydrosalpinx, heterogeneity to the uterus, and asymmetric thickening of the lower esophagus. <u>See</u> T.274-75. An MRI showed that the hepatic lesions were benign

---

[2]
Numerals preceded by "T." refer to pages in the transcript of the administrative transcript, submitted as a separately-bound exhibit by Defendant.

hemangiomata. T.271; see also T.273.  Dr. Robillard recommended an upper endoscopy to rule out esophageal cancer.

On April 2, 2009, Plaintiff underwent a transvaginal and limited transabdominal pelvic ultrasound with doppler study at Windsong Radiology Group in Hamburg, New York, based upon a CT scan which showed a possible right hydrosalpinx. T.268-69. Dr. Cynthia Fan stated that there was a tubular, fluid-containing structure which could represent a small hydrosalpinx versus a right paraovarian cyst; a follow-up pelvic ultrasound was recommended. T.268.

On April 9, 2009, Dr. Robillard performed an upper endoscopy on Plaintiff, following her abnormal CT scan "suggestive of potentially esophageal neoplasm and dysphagia." T.264; see also T.265-66. The endoscopy revealed some inflammation and edema at the GE junction. The biopsies showed Barrett's esophagus[3], see T.267. Dr. Robillard noted he would try dilating the lower esophagus at a later date. T.264.

On November 9, 2009, Dr. Joseph G. Cardamone performed a right carpal tunnel release on Plaintiff. T.381. When Dr. Cardamone saw Plaintiff in follow-up on December 28, 2009, she was doing "fairly well" with a "bit of swelling" and "some tingling" in her right

---

[3]

Barrett's esophagus is a serious complication of gastroesophageal reflux disease in which normal tissue lining the esophagus changes to tissue that resembles the lining of the intestine.
http://www.webmd.com/heartburn-gerd/guide/barretts-esophagus-symptoms-causes-and-treatments.

hand. T.387. Dr. Cardamone noted that she was still unable to work at that time. Id. He suggested having surgery to release the left hand in Spring 2010. Id.

On August 24, 2010, Plaintiff was seen by Dr. Annette Sunga at Roswell Park Cancer Institute regarding her liver hemangiomas. T.63-65. She had experiencing right upper quadrant abdominal pain for over a year, worsening after eating and with breathing, and unrelieved by pain medication.

Plaintiff returned to Roswell on August 31, 2010, noting that the pain now was radiating posteriorly and flank. T.66. Although she has confirmed hemangiomas, her symptoms could be caused by cholelithiasis or cholecystitis; accordingly, an ultrasound and other tests were ordered to rule out these conditions. T.67; see also T.68-69.

Plaintiff was seen at Roswell again on September 9, 2010, T.58-61, and September 21, 2010, T.55-57, by Dr. Boris Kuvshinoff. In addition to the abdominal pain, she was having chest pain. She apparently had a coronary angiogram at Millard Fillmore Gates on July 14, 2010. T.58. Dr. Kuvshinoff noted that he spent considerable time discussing treatment options for what appears to be a very symptomatic giant hemangioma. Plaintiff also appeared to have an active infection in her left lower lung, which was treated with Cipro. The plan was to perform a laparoscopic right hepatectomy on October 18, 2010. T.56. However, the administrative

hearing was held on October 21, 2010. There are no further records regarding treatment Plaintiff received for her hemangioma.

### B.   Psychiatric Records

On October 11, 2007, Dr. Kalalselvi Rajendran dictated a discharge summary for Plaintiff upon her release from the Niagara Falls Memorial Medical Center ("NFMMC") psychiatric unit. T.253-54. She had been admitted on October 3, 2007. With regard to the events leading up to the hospitalization, Plaintiff stated that after leaving her abusive common-law husband and five children in Canada in April 2007, Plaintiff was deported to the United States because he "pulled her sponsorship."   T.253. The common-law husband allegedly stabbed her in the leg and "put a nail through her head" and had been sexually abusing her for years. Id. She stated that the day before her admission to NFMMC, she had been raped by the owner of the Passport Inn motel. Plaintiff went to the casino and complained about the assault, and an employee called the hospital. It is unclear from Dr. Rajendran's note whether Plaintiff was brought to the hospital or came on her own volition. In any event, she was admitted to the psychiatric floor for further evaluation of suicidal ideation and depression. T.253; see also T.255-56. Her intellectual function was average; insight and judgment were poor. She was "very depressed, afraid of losing control, very nervous, anxious, tense." T.256. Dr. Rajendran's Axis I diagnoses were adjustment disorder with depressed and anxious mood, post-traumatic

stress disorder, and major depression recurrent, with anxiety. T.256. On Axis IV (psychosocial and environmental problems), Dr. Rajendran noted "[m]oderate to severe, current GAF is 30-35[4] problem [sic] and decompensation, depression, anxiety." T.256. Her prognosis was "[g]uarded". Id.

On October 4, 2007, at the request of Dr. Rajendran, Dr. Hee K. Choi examined Plaintiff, who denied any history of cancer or diabetes. She admitted smoking 2 packs of cigarettes a day but denied using alcohol, crack cocaine, marijuana, or heroin. T.256. She noted that her father died of colon cancer and her mother is alive but has diabetes. T.257. Dr. Choi's physical examination of Plaintiff was within normal limits. Id.

Plaintiff was discharged on October 11, 2007. Dr. Rajendran indicates that during the course of her hospitalization, she was given chemotherapy, supportive therapy, and milieu therapy. T.253. However, it is unclear what the chemotherapy was for; Dr. Rajendran simply indicates a "history of gallbladder cancer" in his note. T.256. Upon discharge, Dr. Rajendran's Axis I diagnoses were the same as upon admission; his Axis IV diagnosis was "mild" with a GAF of 55. Plaintiff was prescribed Lexapro, Ativan, and Seroquel. She

---

[4]

"The GAF Scale used at Axis V is 'for reporting the clinician's judgment of the individual's overall level of functioning. . . .'" Brown v. Commissioner of Social Sec. No. 13 Civ. 827(JMF)(GWG), 2014 WL 783565, at *1 n.5 (S.D.N.Y. Feb. 28, 2014) (quoting Diagnostic and Statistical Manual of Mental Disorders 28-34 (4th ed., text revision 2000) ("DSM IV"). "A GAF of 31 to 40 indicates '[s]ome impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" Id. (quoting DSM IV at 34; alteration in original).

was discharged to Community Mission for sexual assault counseling and mental health services. T.254.

On May 12, 2008, Plaintiff returned to see Dr. Rajendran "with the chief complaints of 'I need medication.'" T.243. She denied any alcohol or drug problems. She said she was feeling depressed, anxious, and needing to "check things over and over again." Id. Dr. Rajendran diagnosed her with adjustment disorder with depressed and anxious mood, and depressive disorder not otherwise specified, rule out major depression recurrent; these diagnoses were due to Plaintiff's "situational problem, missing the children, lonely in America. . . ." Id. Dr. Rajendran assigned a GAF of 50-55.[5] Id.

Plaintiff returned to see Dr. Rajendran on June 30, 2008, stating she was unable to work because she continually has flashbacks about the 2007 rape. She said that she was "content with her progress and staying with her fiancé, helping him out." T.245. Her medications were continued, and Trazodone was added to help her insomnia. Id.

On July 28, 2008, Plaintiff and her fiancé saw Dr. Rajendran. However, the fiancé left the appointment because he was "in a bad mood." T.246. Dr. Rajendran noted that there was "[n]o immediate

---

[5]
"A GAF of between 41 and 50 indicates '[s]erious symptoms or any serious impairment in social occupational, or school functioning.'" Brown, 2014 WL 783565, at *1 n.5 (quoting DSM IV at 34; alteration in original). "A GAF of 51 to 60 indicates '[m]oderate symptoms or moderate difficulty in social, occupational, or school functioning.'" Id. (quoting DSM IV at 34; alteration in original).

dangerness [sic] . . . but patient seems to be under [a] lot of distress." Id.

Plaintiff began counseling at Hamburg Counseling Service, Inc. on March 17, 2009. T.259. She complained of not sleeping, being afraid to leave the house, not driving, hyper-vigilance, and being fearful of her ex-boyfriend and the man who raped her. T.260. She had increased anxiety, and was obsessively "cleaning, checking." Id. She attended follow-up counseling sessions on March 24, 2009; and April 7, 2009. She felt her anxiety was overwhelming and she was lashing out at her roommate "over nothing". Licensed Clinical Social Worker Jane Ferraro ("LCSW Ferraro") discussed using the "Stop" technique to quiet her mind.

Plaintiff attended additional appointments at Hamburg Counseling on April 15, 2009; April 22, 2009; and April 28, 2009. See T.281-83. She complained of mood swings, feeling depressed most of the time; but occasionally having what appear to be hypomanic states (racing mind, not sleeping, increased energy). She claimed hearing voices of her deceased parents telling her different things, mostly criticizing her. She stated that the Seroquel helped the voices go away. She denied that these voices tell her to harm herself and denied any paranoia. T.282. Dr. Dham Gupta's diagnoses were as follows: bipolar disorder, mixed, in partial remission; post traumatic stress disorder ("PTSD") (Axis I); and cluster B

-8-

traits[6] (Axis II). Dr. Gupta continued her on Lexapro, started Lunesta, and reintroduced Seroquel.

On May 13, 2009, consultative physician Kathleen Kelley, M.D. examined Plaintiff at the request of the administration. See T.286-91. Dr. Kelley noted that she was in no acute distress and was complaining throughout the exam, especially regarding her knees. Her gait and stance were normal; she used no assistive devices; and needed no help changing or getting on or off the table. With regard to her daily activities, Plaintiff cooked, cleaned, and did laundry everyday. T.288. Only when someone accompanies her will she go shopping. Id. Dr. Kelley's diagnoses were as follows: bipolar illness; bilateral carpal tunnel syndrome for which she had surgery on one hand; nonspecific degenerative disc disease without radiculopathy, weakness, or bladder or bowel compromise; diabetes "per claimant, but really hypoglycemia with no known sequelae to her knowledge at this time except dry eyes"; hypertension; asthma by history; restless leg syndrome; GERD with Barrett's esophagus; hypercholesterolemia; obesity; breast reduction, remote; rape by history. T. 290. Dr. Kelley opined that "bending or twisting repetitively of the lumbar spine, when it acts up, will require

---

[6] "Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior. They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder." See http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111.

comfort breaks"; lifting, carrying, or reaching for markedly heavy objects or pushing or pulling on markedly heavy objects will require comfort breaks due to her back (if it flares up) and her carpal tunnel syndrome. Repetitive activity of both hands will require comfort breaks. Dr. Kelley found no other obvious limitations;[7] "[a]ll [other limitations] would be psychiatrically related." T.290.

State disability medical consultant W. Skranovski completed a Mental Residual Functional Capacity Assessment on May 29, 2009. See T.308-10. In the areas of understanding and memory, and sustained concentration and persistence, the consultant found that Plaintiff was "[n]ot significantly limited". T.308. In the area of "social interaction", the consultant found "[n]o [e]vidence of [l]imitation" in Plaintiff's abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers. The consultant found Plaintiff "[n]ot [s]ignificantly [l]imited" in her abilities to interact appropriately with the general public, to ask simple questions or request assistance, and to maintain socially appropriate behavior and adhere to basic standards of neatness. T.309. In the area of "adaptation", the consultant found Plaintiff "[m]oderately [l]imited" in the ability to set realistic goals or make plans

---

[7] See also Physical Residual Functional Capacity Assessment completed by Single Decision-Maker J. Cumbo on May 30, 2009. T.312-17.

independently of others, and "[n]ot [s]ignificantly [l]imited" in her ability to respond to changes in the work setting and to be aware of normal hazards. T.309. In the narrative section of the assessment, the consultant noted that "TS documentation shows good response to treatment/no evidence of related functional limitations. Recent comprehensive MSE shows pleasant and cooperative patient with intact basic ADL-related skills and intact memory/concentration." T.310. The consultant found that Plaintiff's statements about her limitations on traveling alone were "not supported by objective data", and there was "no diagnosis of MR/Dementia/Panic Disorder with Agoraphobia/OCD." T.310. The consultant found "no related functional limitations" due to Plaintiff's allegations of OCD, PTSD, and bi-polar disorder. Id.

Plaintiff missed three appointments at Hamburg Counseling on May 21, 2009; June 9, 2009; and June 15, 2009. On June 16, 2009, she was notified that she was in danger of being discharged from the medical clinic if she did not reschedule. T.331-32. On June 18, 2009, her social worker noted that Plaintiff was having "many health problems" which caused her attendance at counseling to be "erratic". T.336. There are no further records from Hamburg Counseling in the record.

Plaintiff was admitted on an out-patient basis to the Community Concern-Mental Health Clinic on December 23, 2009, for

treatment of symptoms of PTSD and depression. Axis I diagnoses were PTSD and major depressive disorder, recurrent, mild. T.423.

Dr. Gupta and Social Worker Valerie Nowak completed a psychiatric evaluation of Plaintiff on April 27, 2010, noting that she recently had been admitted to Lake Shore Hospital because of panic attacks. T.425. Plaintiff was pleasant with a mildly anxious and depressed mood; fair memory and concentration; at least average cognition; fair insight and judgment; and no evidence of thought disorder. Axis I diagnoses were bipolar disorder, mixed, in remission; PTSD, by history. T.426. Axis II diagnoses were Cluster B traits. Id.

Plaintiff was discharged from Community Concern on June 24, 2010, because she "consistently missed appts that were scheduled – no reason given." T.421. However, she returned to Community Concern on October 12, 2010. T.431. She had been referred by Mercy Hospital where she had been hospitalized for 5 days with double pneumonia. She was prescribed Celexa and diazepam in the hospital but was told she was bipolar and may need "something more." T.431. Plaintiff recounted an extensive history of abuse and trauma (being molested by an adoptive step-brother; being abused for 20 years by her ex-boyfriend; being raped; having to leave her children in Canada when she escaped from her abusive ex-boyfriend). This causes nightmares, jumpiness, and flashbacks. She reported she is depressed, "barely" sleeps, has panic attacks daily, and is

irritable more often than not. Plaintiff scored 69 on the Zung Anxiety Scale, which placed her in the "Severe to Extreme" range; she scored 75 on the Zung Depression Scale, in the "Severe to Extreme" range. T.431. Axis I diagnoses were PTSD and major depressive disorder, recurrent moderate. The treatment plan included individual therapy using cognitive and supportive techniques. Plaintiff was scheduled to see her psychiatrist, Dr. Gupta. T.432.

## IV.  Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

This Court must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112

(2d Cir. 1984). "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, then considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.    Eligibility for Supplemental Security Income

To establish disability under the Act, a claimant bears the burden of demonstrating (1) that she has been unable to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment has been demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 416.920; see also Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999). The burden of

proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that she is unable to perform any of her past relevant work, there is a limited burden shift at the fifth step to the Commissioner, who must determine whether the claimant is capable of performing other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920; see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). In making his decision, the ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quotation omitted).

## VI. The ALJ's Decision

The ALJ applied the five-step sequential evaluation and, at step one, found that Plaintiff had not engaged in substantial gainful activity since the application date. At step two, he found that Plaintiff has the following severe impairments: obsessive/compulsive disorder ("OCD"), PTSD, bipolar disorder, depression, carpal tunnel syndrome, hypoglycemia, and obesity. The ALJ found the impairments were not severe enough to meet or medically equal any listed impairments. T.20. Specifically, Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of

Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Disorders). T.20-21. Looking at the "Paragraph B" criteria, the ALJ assessed that in activities of daily living, Plaintiff has mild restriction; in social functioning, Plaintiff has moderate difficulties; with regard to concentration, persistence or pace, Plaintiff has moderate difficulties; and Plaintiff has experienced one to two episodes of decompensation, each of extended duration. T.21. Because Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "Paragraph B" criteria are not satisfied. Id.

With regard to Plaintiff's residual functional capacity ("RFC"), the ALJ found that she can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; can stand and/or walk for six hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can occasionally perform fine manipulations; should avoid concentrated exposure to dust, fumes, gases, poor ventilation and other respiratory irritants due to her history of asthma; and can perform the basic mental demands of unskilled work, including the ability to understand, remember, and carry out simple instructions in a low stress, low contact work environment. T.22. The ALJ found that Plaintiff was a younger individual with a high school education and no past relevant work. Considering these factors and her RFC, there were jobs that exist

in significant numbers in the national economy that Plaintiff can perform. The ALJ determined that a finding of "not disabled" was appropriate because Plaintiff's additional limitations would have little effect on the job base for light, unskilled work. T.28.

## VII. Plaintiff's Contentions

### A. Failure to Obtain a Medical Source Statement from a Treating Psychiatrist

Plaintiff argues that the ALJ failed to develop the record by not requesting an RFC assessment from her treating psychiatrist.

It is well-settled in the Second Circuit that the ALJ must affirmatively develop the administrative record, given "the essentially non-adversarial nature of a benefits proceeding." Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1992). This duty exists even when, as here, the claimant is represented by counsel. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). The record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity. See 20 C.F.R. § 404.1513(e)(1)-(e)(3); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5. If the record is inadequate, the ALJ first will contact the claimant's treating source to obtain the information, or if the information is not readily available from the treating source, the ALJ may ask the claimant to attend a consultative examination at the Social Security Administration's expense. 20 C.F.R. § 416.912(d)(1), (2); 416.912(e).

-17-

Here, there is no indication that the ALJ ever contacted any of the mental health care providers who have treated Plaintiff over the years. Although Plaintiff underwent a consultative physical examination, she was not asked to attended an examination by a consultative psychologist. Thus, no psychiatrist, psychologist, social worker, or counselor examined Plaintiff and gave an opinion regarding the functional limitations caused by her multiple and long-standing mental impairments. The only mental RFC assessment in the record was completed by a non-examining state disability medical consultant. <u>See</u> 20 C.F.R. §§ 416.912(b)(6), 416.913(c), and 416.927(f)(2). The ALJ did not explicitly mention the non-examining state medical consultant's mental RFC assessment; his only mention of the opinion evidence in the record was to "note[ ] that no physician has said she was disabled or has limitations greater than those given on the above residual functional capacity." T.27. However, no physician or psychiatrist ever was asked to opine regarding Plaintiff's disability or functional limitations. <u>See</u> <u>Ubiles v. AStrue</u>, No. 11-CV-6340T(MAT), 2012 WL 2572772, at *9 (W.D.N.Y. July 2, 2012) ("[I]t is unreasonable to expect a physician to make, on his own accord, the detailed functional assessment demanded by the Act in support of a patient seeking SSI benefits.); <u>see</u> <u>also</u> <u>Rosa v. Apfel</u>, No. 97 Civ. 5831(HB), 1998 WL 437172, at *4 (S.D.N.Y. July 31, 1998) ("[T]he ALJ found that Dr. Pajela's report did not indicate the presence of

significant functional limitations. However, this finding mischaracterized the nature of Dr. Pajela's report, which simply did not evaluate this issue at all. A simple follow-up request from the ALJ could have resulted in an assessment of the claimant's residual functional capacity from his treating physician.")

The ALJ apparently justified his refusal to contact Plaintiff's mental healthcare providers or to request a consultative psychological exam on the basis that he found Plaintiff's mental health treatment to be "spotty" and "inconsistent". The Court has found no support in the caselaw or the regulations for the proposition that a claimant's noncompliance with treatment excuses an ALJ's regulatory duty to assemble a complete record.  Indeed, before relying on noncompliance with treatment to discredit a claimant's testimony about the severity of her impairments, the law requires the ALJ to consider whether there was a justifiable reason for the claimant to discontinue the indicated treatment. Roat v. Barnhart, 717 F. Supp.2d 241, 266 (N.D.N.Y. 2010) (citing SSR 82-59; Reals v. Astrue, No. 08-CV-3063, 2010 WL 654337, at *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from . . . poor insight . . . predispos[ing] the individual to noncompliance with treatment . . . ."); Bauer v. Astrue, 532 F.3d 606, 607 (7th Cir. 2008) (discussing the availability of treatment for bipolar disorder but concluding that "many patients do not

respond well to treatment, or have frequent relapses") (citations omitted)).

The record indicates that Plaintiff's combined mental health impairments are long-standing and have, on at least one occasion, required inpatient psychiatric care.  Because the record contains no assessment from an examining provider, much less a treating source, quantifying Plaintiff's mental limitations, the Court finds that the record was not sufficiently complete for the ALJ to render an accurate RFC. See Lawton v. Astrue, No. 1:08-CV-0137 (LEK/DEP), 2009 WL 2867905, at *16 (N.D.N.Y. Sept. 2, 2009) ("The record in this contains no assessment from a treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination.") (citing Hopper v. Commissioner of Social Sec., No. 7:06-cv-0038, 2008 WL 724228, at *11 (N.D.N.Y. Mar. 17, 2008) (remanding, in part, because the ALJ failed to re-contact claimant's treating physicians after noting that the record did not contain an RFC or medical source statement from any of claimant's treating physicians); Dickson v. Astrue, No. 1:06-cv-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (remanding, in part, for failure to re-contact claimant's treating physician to request an RFC assessment); Garrett v. Astrue, No. 05-cv-6524, 2007 WL 4232726, at *9 (W.D.N.Y. July 18, 2007) (questioning the fact that the record contained no RFC assessments

from any of claimant's treating physicians and remanding the case with instructions that the ALJ obtain RFC assessments from claimant's treating physicians that quantified claimant's exertional impairments)).

The ALJ's failure to contact Dr. Gupta in an attempt to obtain an RFC or medical source statement constitutes a breach of his duty to develop the record, and provides a basis for remand. E.g., Lawton, 2009 WL 2867905, at *16. On remand, the ALJ is directed to request a mental RFC assessment or medical source statement from Dr. Gupta or some other acceptable medical source regarding the functional limitations caused by Plaintiff's mental impairments.

**B.   Failure to Adequately Account For Plaintiff's Limitations in Dealing with Stress in the RFC**

Plaintiff argues that the ALJ's RFC, restricting Plaintiff to unskilled work in a "low stress, low contact" environment, did not adequately take into account the functional limitations caused by her various severe mental impairments on her ability to deal with everyday stressors. The Court agrees.

"Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called 'low-stress' jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work." Stadler v. Barnhart, 464 F. Supp.2d 183, 189 (W.D.N.Y. 2006) (citing SSR 85-15; Welch v. Chater, 923 F. Supp.

17, 21 (W.D.N.Y. 1996) ("Although a particular job may appear to involve little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments")); see also Smith v. Astrue, No. 09-CV-470 TJM/VEB, 2011 WL 6739509, at *7 (N.D.N.Y. Nov. 4, 2011) ("The ALJ did not make sufficient findings concerning Plaintiff's particularized ability to deal with stress, other than to generically conclude that she was limited to 'low stress' work.").

On remand, the ALJ will address statements by Dr. Gupta (or the acceptable medical source who completes the mental RFC assessment) concerning Plaintiff's difficulties handling stress, and consider how those difficulties affect her ability to work. The ALJ also will consider whether, in light of Plaintiff's nonexertional impairments, a vocational expert should be called to testify.

### C.    Other Contentions

Because the errors identified above constitute independently sufficient grounds for remanding this case, the Court need not address Plaintiff's remaining contentions.

## VIII.    Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted to the extent that the Commissioner's decision

is reversed, and the matter is remanded for further administrative proceedings consistent with this Decision and Order.

**SO ORDERED**.

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    May 19, 2014
          Rochester, New York